Chief Justice Maeshall
delivered the opinion of the Court.
These three writs of error are prosecuted"for the reversal of a decree -rendered in the two consolidated cases of Pope’s adm”r. vs Rowan’s exec’rs., and Lytle’s ■exec’r.; and heirs, &c., and of Hatch against the same. The bill of Pope afterwards revived by his Executors was filed on the 29th-of October 1830, that of Hatch on the 15th of March 1839. Each complainant ’sets up distinct claims against William Lytle, and each seeks to subject to the satisfaction of his claim certain lots and lands in Louisville and Portland, formerly the property of Lytle, and alleged to have been purchased by Rowan under execution, in fraud of Lytle’s creditors, or in trust for him. Large portions1 of this property 'have *298 been conveyed by Rowan to the heirs of Lytle, and much of it has been sold and conveyed by these parties to others; considerable portions being still retained by Rowan up to his death, and by the Lytles’ or some of them. The decree ascertained the respective demands of the complainants, decided that Rowan had purchased and held the property in trust for Lytle, and subject to his debts, and had conveyed to his heirs in pursuance of the trust and subject to the same liability, and decreed, for the satisfaction of the demands now in question, a sale first of the property which had been conveyed by Rowan to Lytle’s heirs, including some which had been sold and conveyed by them, and especially the interest so conveyed to the city of Louisville in the wharf in front of the city, and should this be insufficient, a sale of the portion retained by Rowan and devised to his executors.
The errors complained of by defendants in the Court below, as well as complainants.
The errors assigned on the part of the defendants in the suits, question the justice of every part of the demands set up in the bills, and the propriety of decreeing any thing or so much as has been decreed, and of subjecting the lots and lands purchased by Rowan. Lytle’s representatives complain of their property, and that which they have sold, being subjected first, or at all. While Rowan’s executors complain that the property held by them is subjected in any event. On the other hand, the complainants in their respective writs of error, and by cross errors assigned, complain that the sums decreed to them are too small and that no discrimination should have been made in subjecting the property of the different defendants. The city of Louisville which was made a defendant, also complains of the subjection of her interest in the wharf as conveyed by the Lytle’s.
We shall first consider the cases of Pope and Hatch separately, in the investigation of the demands set upin their bills, and shall then consider the question of the liability of the property subjected by the decree, as to which, the cases are substantially the same.
The ground of Pope’s demand against Lytle.
The bill of Pope charges that on the 10th day of October, 1821, R. Todd, R. S., deceased, was indebted to the Bank of the U. S., in the sum of $9128, and also in the sum of $470; and on-that day executed to the Bank payable at the Louisville Branch his two notes for like amounts with William Lytle and the complainant as his sureties. And he further charges that these notes were executed to take up and renew two notes of like amount due by Todd payable to Lytle and by him endorsed to complainant and by him to the Bank, that on these notes Todd and Lytle were both responsible to him, and that he agreed only to go into the' joint notes aforesaid as surety of Todd at the instance and upon the joint responsibility of Lytle and' Todd, and it was agreed between himself and them that it was not to change his position in regard to their responsibility to him, but that it should continue as before;that Todd died totally insolvent leaving the- debts, unpaid, and that Lytle from the year 1820, until the filing of the bill, has been in embarrassed circumstances, and has ever since lived out of, and is still out of this State,, and a non-resident thereof. And complainant has been compelled to pay the debts aforesaid. And so he charges that Todd and Lytle are indebted to him to the amount of the notes aforesaid, to wit, upwards of the sum of $10,000, no part of which is paid.
The bill then proceeds to state the facts and grounds on which the estate in Rowan’s hands is sought to be subjected, and making Lytle and Rowan, and C. M. Thruston, as administrator of Todd, defendants, prays that he have a lien on said lands, &c., and so much as-may be necessary, be sold for the satisfaction of his demands, and for a decree against Rowan therefor if necessary, and for general relief.
An order of publication was made against Lytle as a non-resident defendant. And the suit was subsequently revived against his heirs as non-residents. Most of whom in consequence of deaths occurring during the pendency of the suit were infants, and had answered' *300 by gtiardian before the hearing. No other answer was' filed on the part of Lytle’s heirs. But Rowan and afterwards his executors, filed answers contesting every part of the case, and particularly denying the alleged agreement and circumstances under which Pope says he executed the joint notes, and which are not proved, also denying that he had paid the debt when he filed his bill. Alleging that by arrangement between Pope and the U. S. Bank, he mortgaged to the Bank in 1827, for the security of this debt of $9128 and other debts, a large lot in Louisville, upon the terms that he should have five years ending in 1832, to make payment of the principal, and was not to be charged with any interest upon this debt from its maturity to the end of five years* but that the Bank w7as at liberty to proceed against the other parties for the interest, all of which appears from the mortgage. And that in 1831, and 1832, sales were made of this mortgaged property on a credit of two years without interest, and the notes and securities for these sales were taken by the Bank without charging or discounting the interest as payment of the debts secured by the mortgage, and that this note of $9128 was not thus paid until September, 1831, and they rely on the fact that Pope’s payment under this agreement did not discharge Lytle from the intermediate interest from the maturity of the note, amounting to near $6000, but that the same was paid by him, or his estate is liable for it. These defendants also charge that in 1819, the debt of Todd to the Bank, for which this note for $9128 was executed, though originatingin anote in which Todd was the maker, and Lytle and Pope endorsers, stood in the form of a note executed by Pope, and endorsed by others for him. And that in consideration of this liability for Todd’s debt, Todd in that year conveyed to C. M. Thruston- a large amount of property to indemnify Pope, and which was amply sufficient for that purpose; and would have indemnified him if he had applied it as he should have done. And they contend that he cannot call upon Lytle for con *301 tribution without showing the disposition made of the trust property. This deed of trust is exhibited. They also setup a mortgage; made by Todd to Pope in De~ cember, 1821, conveying a large property in Louisville' and Portland, to indemnify him as surety in the joint note for $9128, since paid by Pope, and allege that Pope might and should have realized from this mortgage more than enough to indemnify him.
An amended bill filed by Pope’s administrator, alleges that Pope never accepted the deed of trust to Thruston-or the benefit thereof, but rejected it when informed of it, because Todd had no title to the property. It admits that square No. 2, of four acres, and 200 feet of square No. 3, conveyed by the mortgage of 1821, arid a sum of money on account of 30 acres of land therein conveyed, have been'received, but say the title to the 200 feet of square No. 3, is doubtful, and deny , that they are accountable for the money received for the 30 acres.
The infant heirs of Lytle in their answer by guardian plead and rely upon the statute of limitations, lapse of time and payment.
The mortgage of 1821, from Todd to Pope, professes not only to indemnify -Pope on account of his surety-ship in the note for $9128, but also to secure him in a debt to himself, for money loaned to and paid for Todd and other debts, without further specification of dates, sum or consideration. And the decree charging Pope with nothing under the deed of trust of 1819, or the mortgage of 1821, except the square No. 2, at its value when received by him and the money paid him on account of the 30 acres, divided the aggregate pro rata between the debt of $9128 and an assumed debt from Todd to Pope of $2500, and credited on the $9128, with its interest, its pro rata portion only of the aggregate sum thus divided. And decreed interest to Pope’s administrator from a time prior to the end of the five years allowed him by the Bank, and prior to the time *302 when the notes passed to the Bank in payment became due or bore interest.
A complainant is entitled to relief to the extent which he provea under his allegations, and his bill should not be dismissed because he fails to prove all he claims.
A surety may, after assuming and securing the debt to the creditor, proceed vs a co-surety for contribution.
It is now contended that Pope’s bill should have been dismissed on several grounds. And 1st, because he failed to prove that he had become surety for Todd and Lytle at their request, and on their joint responsibility as alleged. And because his pleadings were never amended so as to conform to the fact. But he first alleges that he was surety with Lytle -for Todd which would entitle him to contribution as co-surety, and then alleges circumstances which if tiue, would entitle him to claim from Lytle whatever he had paid. Having proved so much of his case as entitles him to contribution as co-surety, his failure to prove the residue should not deprive him of the relief to which he has shown himself entitled. And although he seems to claim the whole amount of his payment upon the basis of the allegation which is not proved, it would be too strict a construction of the bill to limit his claim to that basis. And under the general prayer of his bill he is entitled to as much as his proof within the allegations, shows to be justly due.
2. The second ground for a dismissal of the billis that the note for §9128 had not been paid by the complainant until after the bill was filed. But independently of the question whether he might not have gone into equity before piyrnerit of any part of the debt, we are of opinion that having in 1827, assumed the payment of the principal of this debt, and secured its payment with others in five years, and having before September 1830, paid into the Bank, notes for upwards of $14,000, the proceeds of sales of the mortgaged property received in satisfaction of the mortgaged debts, and which after paying his own individual debt, was nearly or quite sufficient to discharge the note now in question, it may be assumed that he had paid at least a considerable portion of that note when the bill was filed, up to. which time the sales were progressing. It is true, no* appropriation of the payments had been then made by *303 the Bank; nor was afterwards made until the whole mortgage debt was paid about the first of September 1831. And the notes received for the sales may not have been regularly entered on the books of the Bank until that time. But they had been paid and received in satisfaction under an agreement between the parties, which was sufficient between Pope and his co-surety. And if Pope had not the right to apply i his first payments to this note, so as to say that it was wholly paid when the bill was filed; and if he could not recover for the payment afterwards made because it was not included in his allegation, we think it was scarcely necessary for him to amend his bill to allege a fact stated by the answer which admits full payment about September 1831.
One for whose benefit a deed of trust is made, but who never accepted its provisions hut repudiated them, is not to be prejudiced thereby.
With regard to the deed of trust of 1819, the failure to make which available or to account for the property is urged as aground of dismissing the bill, it is to be observed that the property is not directly conveyed to Pope. And although the fact that the deed was acknowledged and recorded in the office of which he was clerk, might afford an inference that he was apprized of its execution and contents, this inference is weakened if not destroyed by,the circumstance that the deed is attested by a deputy. It is to be recollected too that when the deed was made, the debt stood on the note of Pope with his endorsers, and that within a year or two it was substituted by the note of Todd himself with Pope and Lytle as his sureties. And although a Court of equity might for the sake of the beneficiary, regard the trust as still subsisting, it would be quite natural that the parties to this transaction might consider it as at an end, which is rendered probable by the execution of the subsequent mortgage to Pope, without providing for any disposition of the property in the deed of trust. Besides there were other beneficiaries in that deed— there is no evidence of the title or value of the property. And there is no ground to suppose that any part of it ever'came to the use of Pope who is not shown to *304 have accepted its provisions, and was not bound to do-so. Then it is proved by C. M. Thruston, the trustee, that Pope when informed of the deed, refused to have any thing to do with it, and that he himself did notact under it, although he had executed it. This deposition was taken on leave, and although it is excepted to on the ground of incompetency of the witness, we do not perceive any interest which should exclude him. As administrator of Todd he is but a formal party and subject in one event of the suit no more than in the other. For Todd was liable for the debt whoever might pay it, unless it was paid by his property which Thruston disproves. But Todd was insolvent, and his administrator got nothing. As trustee there is no attempt to make him liable, nor could he be made liable upon any allegations in the pleadings, and certainly not by Pope’s administrator, who alleges that his intestate did not accept the benefit of the deed. And if he did it was bis own neglect not to enforce it. In addition to all this, the lapse of time would protect Thruston.
We think therefore that the deed of trust of 1819, •was properly allowed no influence in the case. The ¡mortgage of 1821, which was executed by Pope as w-ell as Todd, stands upon different grounds. By consent >of Pope and Lytle, the Bank of the U. -S., filed a bill in 1822, to foreclose this mortgage and sell the property dor payment -of the note for $9128, &c. And after .some years obtained a decree for the sale of all -of it. The property was sold except the 30 acres and some -other lots whieh were previously encumbered or disposed of by Todd, and the Bank through its agents, pur-chased what was sold at nominal prices. The 30 acres -which as this mortgage states was claimed by Todd un- ■ der a bond from Lytle, had been included in a prior ¡mortgage from Lytle to the Bank of the U. S., and .were sold under that mortgage, and the Bank being the purchaser sold them as part of a larger tract to Ja-cob & Duncan, for about $40 per acre. ' Pope filed his ¡bill against the Bank and Jacob & Duncan, claiming *305 that the 30 acres should have been sold under his mortgage, that the Bank had notice of Todds bond before the date of her mortgage, and that Jacob & Duncan also had notice, &c. And he claims the 30 acres, or its value at $200 per acre, and alleging that the purchases under his mortgage were made by the Bank by agreement for his benefit and at nominal prices, claims the property so purchased except some portions to which he admits Todd had no title. The defendants denied his claim and its alleged grounds, but finally the suit was compromised by paying to Pope the sum of more than $1500 for which the 30 acres had been sold, and by turning over to him the other property purchased under his mortgage, except such as Todd had no title to Under these indefinite terms it is difficult to ascertain precisely, the property which was received,
The admission of the administrator has been already stated. And under that admission we do not perceive any sufficient ground for excluding 200 feet of square No. 3, from the property charged to Pope, and especially as his heirs appear to have sold portions of a lot under that description. Whether any other portions of the property were or might have been available seems at least doubtful. Nor do we undertake to decide peremptorily that the portion of square No. 3, should be charged against Pope. But as the decree will be reversed for other causes, there may be an enquiry (unless the parties agree) as to this fact, and whether .the Pope’s hold or have sold this and other property under the mortgage, and also into the value of square No. 2, and other available property received from the Bank, at the time when it was received, the estimate placed Upon it in the decree, being as we think rather low. With regard to the 3Ü acres of land included in this mortgage, we are not satisfied that the Bank had notice of Todd’s bond at the date of her mortgage, and therefore cannot decide that Pope should be charged with the full value as of property which he gave up when he could and should have made it available for his indem *306 nity. Nor on the other hand can we concede the claim of his administrator that the money received for it in the compromise should be regarded as his own and not charged to him in the settlement of his present demand, Although having been sold under Lytle’s mortgage to the Bank, it went in that way to pay Lytle’s debt, still it was probably Todd’s property — was certainly included in his mortgage to Pope, and the money in question having been paid to Pope under and in discharge of his claim under the mortgage, it is substantially so much received from Todd’s property, and must be accounted for accordingly. We are of opinion however, that the claim of $2500 charged pro raía as a debt due to Pope, against the proceeds of this mortgage, and thus diminishing the amount applicable to the principal claim, is not sustained by the evidence. It is not set up in the pleadings, but rests upon a vague statement of a demand to that amount in favor of Pope against Todd made in Pope’s bill against the Bank of the U. S., above referred to, and on the vague recollection and statement, or rather impression of C. M. Thruston, founded to a considerable extent on the bill just mentioned which was drafted by him. He does not show nor profess such knowledge of facts as suffices to establish the debt of $2000 referred to by him, and the only one attempted to be specified. If such a debt existed originating as he supposes in the transfer of a lot at $2000, it would in all probability have been susceptible of proof. .And its non-existence is rendered probable not only by the slender px’oof adduced in its support, and by the absence of any coiToborating circumstance, but also by the fact that no such claim is particularized either in the mortgage or in the before mentioned bill of Pope, and by the fact that no such claim was set up when the Bank was allowed to sue upon this mortgage claiming the appropriation of the entire property to the satisfaction of Todd’s debt to the Bank. These circumstances which at least require that any claim now set up for an individual debt from Todd *307 to .Pope should be clearly established, go far to preclude the admission even of a well established claim to interfere with the application of the mortgaged property to the debt upon the joint note to the Bank. Thruston thinks he has seen a $2000 note from Todd to Pope, but if he has seen such a note since Todd’s death, it is to be recollected that he was Todd’s administrator-lie was the brother-in-law both of Todd and Pope. The only claim of Pope against Todd sufficiently established as existing at and since the death of the latter is evidenced by a judgment against Todd’s administrator for $454 23, contained in this record. Which we think may be admitted to a pro rata distribution of the proceeds of the mortgage chargeable to Pope.
va co-surety who Jjaaebtd leaving co-surety Habie for t!ie remainder, cannot S^nless^the fxeeed^ht/proportion of the whole debt: (6 Vez. 805; Theob. on Prin. and See. 266; Pitman on Prin. and Sec., 150; Chit, on Con., 597, 815; 6 M. & W., 168; 2PothierbyEv’s 77, 81; Story’s Eq.,note 32,sec. 493, a 4th ed.)
*307 We are further of opinion that in ascertaining the amount of the claim of Pope against Lytle on account of payments to the Bank, interest should not commence until two years after'the sales by which the payments we,re made as the sales were on a credit of two years. And the payments made in the sale notes without chaz-ging the intermediate intei-est. It may not be practicable to apply this rule with precision, as the sales were made from time to time through a period of about eighteen months from April 1830, to September 1831, and there was no specific appropriation of the sale notes to this particular debt. It may suffice to take the medium period between the commezzcement and tez’mination of tiie sales, azzd commence the charge of interest two years after that period. The decree as we understand it, commences the charge of interest at a period considerably earlier, and thereby increases the amount of the demands, by several hundred dollars.
But a more radical error is alleged in the principle on which the amount due to Pope for contribution is estimated, that is in decreeing Pope to be entitled to dew T i ii,-,.,. . ' mand irom Lytle, one-halt of his entire payment except so far as re-imbni’sed by Todd’s propei’ty, when in fact he did not pay-the whole debt nor obtain the release of Todd or Lytle therefi’om, but only paid the *308 amount of principle, leaving them liable for the interest from which he alone was exhonerated. It is true the interest seems never to have been in fact paid by Lytle or Todd, and its recovery may now be precluded by lapse of time or other circumstances. But the right to coerce it from them was expressly reserved to the Bank in the arrangement by which Pope was relieved from it. And certainly if the property of Lytle purchased by Rowan may be subjected to the demand of Pope, it might have been subjected at and after the commencement of this suit to the payment of the interest or any other unpaid part of the debt due to the Bank. / As • Pope cannot say in this suit that Lytle was, or'that his estate is insolvent, or that, the balance of the debt could not have been coerced from him, he in effect claims contribution from a solvent co-surety, who at the filing of the bill was, and whose estate for all that appears, still is liable for a large portion of the debt. Suppose, under such circums;ances he had only paid one fourth or one half of the debt, would the Chancellor coerce partial contribution from the solvent co-surety, who still remained liable for three fourths or one'half of the debt? We think he would not. And upon the same principle, if the party seeking contribution has paid more than the half but less than the whole, leaving the co-surety liable for the balance, he would be entitled to contribution only for the excess of his payment above one-half of the debt, after deducting from the whole debt so much as has been paid to the creditor or re-imbursed to the complainant by the principal or from his funds. If events occurring after the commencement of the suit should entitle the complainant to a larger contribution, he should state them so that they may be put in issue, and the facts and their effects distinctly known and considered. " Pope indeed alleges or seems to allege payment of the whole debt by him, which is denied and disproved. And although this does not preclude his claim as founded .on partial payment, it does not lay the ground for a claim of one-half of his partial payment *309 leaving a subsisting demand on the part of the creditor against his co-surcty for the other half.'. Nor is there any allegation which meets that case, or shews that by reason of any fact he is entitled to a contribution of one-half, though it is stated by a witness that in 1845, the interest had not been paid.
Though it may* be true, so far as third persona-are concerned, that there is no Us pendens until process be served; yet as bete’n the parties, the suit may be con-tinned and in existence and pending: UO GUI & Johnson, 326.)
*309 In the case ex parte Gifford, (6 Vesey, 805.) Lord Eldon clearly maintains the principle that a surety can only call for contribution when he pays more than his proportion of the debt, and then for the excess only. This is also conformable to the general principle of contribution as stated by Theobald on principal and surety, side page 266. Although in the note to page 267, the author seems to disapprove of the views of Lord Eldon in the case referred to. The same case is however referred to by Pitman on principal and surety, page 150, and its principle is stated in the text. The same princr pie is also stated in Chitty on contracts, pages 597, and 815, 7th Am. edition, with a reference in the notes to 2 B. & P. 268—6 M. & W. 168—6 Vesey, 805, and 2 Pothier by Evans, 77 to 89.
Judge Story in his Equity Jurisprudence, note 32 to sec. 493, 4th ed., expresses his opinion in favor of the principle above stated, and refers to 1st Pothier on ob. by Evans, as substantially accordant.
We .are of opinion therefore, that Pope’s claim .should be ascertained upon the principal referred to, and should be allowed only to the extent that his payment exceeds one half of the entire debt after deducting the available proceeds of Todd’s mortgage to him, making proper calculations of interest. The decree being greatly more than the sum to be thus ascertained is on this ground also, deemed erroneous.
The case of Pope is not free from difficulty as to the application of the Statute of limitations relied on by the infant heirs of Lytle. Because there had been no appearance by Lytle, nor any'service of process upon him, nor publication of the order for his appearance. And after his death in March, 1831, there was no ef~ *310 fectual step taken to revive the suit, until March, 1838, when a warning order was made upon the bill of revivor. But as bills of revivor had been previously filed, and orders of publication made upon them, though not published, as was the case also with respect to Lytle, who is stated in the bill to be a non-resident. We are not satisfied that for the purpose of reviving and thus continuing the same suit, it should not be considered as pending from the commencement, and especially as a subpoena was then issued against Lytle. While therefore, we are satisfied that as to strangers, there was no lis penclens until service of process or other effectual step for bringing in the defendants, Lyle vs Bradford, (7 Monroe, 116.) Pindell vs Maydwell,(7 B. Monroe, 314.) We cannot decide that the bar of the statute applies; (10 Gill & Johnson, 326.)
Hatch's claim,
We proceed to the case of Hatch.
This bill was filed on the 15th day of March, 1839, by Win, S. Hatch, against John Rowan and the representatives of William Lytle, to obtain satisfaction of several demands against Lytle, by subjecting to sale therefor divers lots and lands in Louisville and Portland, formerly the property of Lytle, and alleged to have been purchased by Rowan in fraud of Lytic’s creditors, or in trust for him, and the title of a large portion of which still remained in Rowan, or in the representatives of Lytle, to whom Rowan had conveyed part of it in pursuance of the trust, and of which large portions had been sold and conveyed by all of these parties.
The first demand set up in the bill arises upon the alleged payment by Hatch of a judgment in favor of the Miami Exporting Company, upon a note for $3800, executed to said company on the 31st of October, 1820, payable in sixty days, and signed by Hatch, Lytle, and Steele, Donally & Steeles, which Hatch alleges was paid by him as the surety of Lytle. To prove which relation he exhibits the following writing, executed by Lytle on the day of the date of the note, and on which he *311 relies as a covenant for the payment of the note, and for his indemnity by Lytle:
To constitute a covenant, the words must impoit an agreement; it is not sufficient that the writing state facts from which an agreement or obligation may be inferred: (2 A. K. Marsh., -122; 3 Dana, 482; 1 J. J. Marshall, 411.)
“Received, Cincinnati, October 31st, 1820, of William S. Hatch, $3900, in full of said Hatch’s note in the Miami Exporting Company, which I have this day assumed, and do this day renew at said Bank for $3800, at 60 days, paying $100 on said note, besides interest and discount, which note for $3800 said Hatch signs in conjunction with Steele, Donally & Steeles, as security, hut which note I am the payer, having informed said Bank to that effect, a copy of said note being below written.
“ Witness of the acknowledgment of the above facts to he present,
“Philip G. Todd.”
Then follows a copy of the note for $3800, as above described. A judgment was rendered on this note in favor of the assignees of the M. E. Company in 1821, for $3971 in damages. And £n the 16th day of April, 1831, an entry was made of record in the same Court that the judgment was satisfied by Hatch. And the present suit having been commenced about seven years afterwards, the statute of limitations and the lapse of time are among other defences relied upon by the defendants as.barring this demand. But the Chancellor, regarding the writing above referred to as a covenant binding Lytle to pay this note, overruled this defence,, and decreed a large sum on account of this demand.
We do not concur with the Chancellor in the effect given to this writing. We think it was intended to be, and is a mere statement of facts, made for the purpose of showing that the real attitude and obligation of the parties to the note, were different from that which would be implied from its face. And this view of it is corroborated by the attesting clause, signed by Todd witness of the acknowledgment of the above facts to be. It is true, no precise form of words is necessary to made a covenant. But if there be no express agree *312 nient, nor such words as technically imply a covenant as demise, and other words in a grant of real estate, to which alone the doctrine of implied covenants applies, the writing must recite words which in themselves, import an agreement between the parties. . And it is not sufficient that the-writing state facts from which an agreement or obligation may be inferred, but the words must .'themselves import the agreement: Wilcoxen v Rix, (1 A. K. Marshall, 422;) Wenzal vs Breckinridge’s Ex., &c., (3 Dana, 482;) Harris vs Ogg, (1 J. J. Marshall, 411.) The words “which I have this day assumed,” refer to an assumption at the Bank; and the words “I am the payer,” are merely equivalent to “I am the principal.” It is true, that upon the facts evidenced by the writing, Lytle was under an obligation to pay the note, and to indemnify Hatch as his surety. But a similar inference arose- and was admitted in the cases just cited, in which it was held that theTe was no covenant to pay the proceeds of property “received by us for for sale,” or to pay the proceeds of a note “received for collection,” or to pay the proceeds of tobacco ■which the party covenanted “to sell at N. O., for the best price, &c.” The writing before us is not, in our opinion, a covenant to do or not to do anything, but is ;a mere memorandum of past and existing facts.
From this view of the subject, it follows that the plea of the Statute was available against this demand, and that no part of it should have been decreed. It is therefore unnecessary to notice the other grounds assumed in opposition to its allowance as far as it was allowed by the decree, or the grounds on which it is contended in support of the cross errors, assigned that too small a sum -was decreed on account of this demand.
The other claim set up in the bill, is for the amount of •a judgment in favor of T. Fosdick against William Lytle, rendered in April, 1823, upon two notes executed by him, one for $2748 53, with interest from August, 1820, the other for $2397 37, with interest from the /!8th day of. May, 1821, which'judgment was assigned *313 by Fosdick to Hatch, in November, 1824. The whole amount of the judgment on the two notes is claimed in the bill. But it is proved that the larger note had been paid to Hatch as stated by himself. And it is contended that the smaller note which Hatch had assigned in December, 1826, to the son-in-law of Lytle, as the bill alleges, for collection only, has also been paid. The claim was re-assigned to him in 1841, and the re-assign-ment admits that it had been assigned by Hatch for collection only, and that payment had not been obtained. This however, is not evidence against the other parties ; and there are several circumstances tending -to create some doubt as to the present subsistence and justice of the claim. Still, as it has been set up by this suit within twenty years after the date of the judgment, and as if it had been paid by the Lytles’, it must be presumed that they would have some direct evidence of the fact which would have been produced in this case, we cannot come to the conclusion that it'has been satisfied or extinguished, but are of opinion that to the extent of the smaller note with its interest, Hatch has made out a valid claim against the estate of Wm. Lytle, dec’d. A contrary conclusion would imply a combination’between the Lytles’ and Hatch, to subject the estate in the hands of Rowan to an unjust claim against their father; and there is neither allegation nor presumption that they have engaged in an attempt so hazardous to their own interests.
Facts and cir cumstances stated and discussed, and conclusion deduced that Rowan purchased the property and held it in trust-for Lytle and his-heirs.
Upon the question whether the lots and land, &c.,, purchased by Rowan under the execution against Lytle remained liable for his debts,-and were in fact held in trust for him, we think there is little room to doubt. Conceding that the purchase was made without any previous agreement or concert between-them, that Lytle residing in Cincinnati, did not know of the levy and sale until after Rowan had purchased, still it seems -to be entirely certain that being the brother-in-law and friend of Lytle, and on important occasions his legal adviser and counsellor, Rowan- did not intend to specu *314 late for his own exclusive advantage upon the sacrifice of Lytles’ large estate, tie was informed of the levy, and in effect applied to, to protect the property, by Foree, to whom Lytle a few months before had conveyed it, evidently as a means of withdrawing it from direct subjection to his debts, and Foree expected him to act in the matter as the friend of Lytle. Thereafter a sale at which there being competition, Rowan bid the omount of the execution for about 50 acres of land, more remote from Louisville, but which was afterwards discovered to have been under mortgage. At a second sale attended only by Rowan and Foree, and the two Wallaces, all friends of Lytle, Rowan in December, 1821, purchased for the amount of the execution, (viz: about $3300 in the depreciated paper currency of the State,) several hundred acres of land including lots in Louisville and Portland, and the land between them, binding on the river Ohio, and perhaps including a part of its bed. A property then estimated at from $50,000 to $100,000, and of which the part retained by Rowan after numerous sales fora very large amount, and after the conveyances to Lytle’s heirs, was assessed for taxes in 1841, at about $100,000. The sale of the land outside of Louisville, was not at the most public place on the tract, and in reference to the actual facts can hardly be said to have been at a public place. For the land outside of Louisville, R. Wallace bid in competition, when he was asked by Rowan if he intended to speculate on Lytle, and upon his answering that he only wished to secure himself as being liable for the debt in execution, and having a contract from Lytle for some of the land, he was told by Rowan that if he, R., became the purchaser, the debt should be paid, and he should have his contract, when his competition ceased — and Rowan purchased at his bid of 3000. On the sale of the lots which immediately followed, Rowan bid for them the balance of the execution, and D. Wallace bid the amount for one lot less, but his bid was afterwards withdrawn upon understanding from Foree *315 or R. Wallace, that Rowan was purchasing as the friend of Lytle, and all the lots werh struck‘off to Rowan, having been sold not separately, but in gross. There is no reason to believe too, that the sale was moré extensive than the levy, and that the Sheriff’s deed made on the same da}*- was more extensive than either. What communications may have passed between Rowan and Lytle after the sale, cannot be known. It is proved that Lytle when informed of it, was greatly amazed and distressed. But although the facts above stated would have furnished plausible ground at least for attempting to avoid the sale, we do not hear that Lytle made any movement or even enquiry with that view. Would a man of ordinary vigilance and regard for his own interest have acquiesced without a single effort, or even question in so questionable a transaction, by which if submitted to, he was to be deprived of so great an estate, and how is this acquiescence to be accounted for?
The sale took place on the 19th day of December; 1821. On the 7th day of January, 1822, we find that Rowan in the form of a letter to' Lytle, but which was sealed and attested by two witnesses, after stating his¡ purchase whereby he says he become the absolute owner, &c., declares that he had determined when he purchased, not to enrich himself, but after paying the execution debt, (for which he was liable,) and other named liens on the land, and fully indemnifying himself for present and future liabilities for Lytle, and for expenses; &c., to convey the remainder to Lytle or his five children, reserving tire right to decide whether he would convey to Lytle or his children, and in case he should not so convey during his life, he bound his hems to convey to Lytle’s children what should remain (after the indemnity, &c.,) after his d.eath. It further appears that on the lith of January, 1822, Foree conveyed to" Rowan upon a nominal consideration, all his right, &c., acquired by the deed from Lytle, for which however; Rowan says he gave him what was equivalent to $1000, and his deed is in the record conveying to Foree one or *316 more lots, part of the purchase. Andón the 16th of February, 1822, Lytle conveyed or released to Rowan for divers good considerations and one dollar, all that he had purchased, thereby confirming the sale, and removing all doubts as to the extent of Rowan’s interest. And by an endorsement on the letter or bond above referred to, Rowan ratified and re-affirmed the obligatory purport and effect thereof, notwithstanding the release of the land by Lytle.
Rowan in his answer maintains that these acts on his part were purely voluntary and wholly independent of the acts of Lytle, and that the release of Lytle was independent of his own acts and intended merely to secure a compliance with the previous sales by Lytle. He also maintains that his letter or bond, and the endorsement thereon, being without consideration were wholly unobligatory. But it seems impossible in view of the ordinary course of transactions, and the common motives of men to separate the acts which have been enumerated, and to regard them as entirely disconnected, and especially when they account naturally for each other, and furnish a rational explanation of the whole chain as causes and effects, and when the acts of the parties cannot be otherwise rationally accounted for. If Rowan regarded his purchase as conferring on him an absolute and indefeasible title, and if his letter and bond to Lytle was the offspring merely of his sentiments of honor and friendship, and if the bond could not have been enforced against him, itmust be assumed that he intended to be bound by it. and that Lytle regarded it as a sufficient assurance that the title was to be held for the benefit of himself and children, and that under this belief he not only acquiesced in, but confirmed the purchase. And even if these acts thus produced did not make the bond obligatory, they were a sufficient consideration for the endorsement of ratification and made it obligatory. These circumstances in connection with the questionable character of the sale, prove and in fact make Rowan a trustee, holding the *317 title for the general purposes mentioned in the bond, and for tiie benefit of Lytle or his children, and so far as creditors are concerned for the benefit of Lytle.
This conclusion is confirmed by the fact that after Lytle’s death, his children asserted right under Rowan’s bond, and that from time to time afterwards, large portions of the property were conveyed to them by him for love and aifection, the bond being surrendered, until at length in 1838, a general deed of partition was made between them, from the tenor of which it may be inferred that they had divided upon some, principle understood between them, and probably that of equality after satisfying such claims as Rowan made upon the property for debts paid, expenses, and compensation.
It appears further, that the Miami Exporting Company, having obtained a decree subjecting the lands purchased by Rowan to a large debt due by Lytle, on the ground that the purchase was void against creditors, and the Bank of the IT. S., having also a large decree against Ljrile which was levied on the same lands. Rowan purchased in these two decrees, and having revived them against Lytle’s heirs purchased the lands again, under a decree foi- their sale in satisfaction of the two debts. And this purchase is relied on as making his title perfect and absolute for his own benefit. But it was after this that hei conveyed to the Lytles. And without going into details upon this part of the subject, we remai’k that not only was Rowan a trustee for the Lytles when hé purchased these decrees, and therefore under peculiar obligations with respect to them and the property, which he could not easily shake off, but there is scarcely a doubt that the purchase was made when he had sold of the trust property more than enough beyond other charges exhibited to make the payments made by him, and that the payments w7ere in fact made to a great extent if not wholly with funds derived from that property. Indeed as to the decree of the U. S. Bank, for which nearly three times as much was to be given as for the other, the payment was secu *318 red by mortgage on a part of the trust propertjq with a stipulation that Rowan was not to be personally responsible, and in conveying part of this piece of property to the Lytles’ a corresponding portion of the burthen was expressly devolved upon it. . The result is that Lytle’s land held in trust has paid these decrees as far as they have been paid. And we are of opinion that Rowan could not, and his executors can not set up against the trust- either his purchase under the decrees, or so much of their amount as was not satisfied by the payments mad.e to the creditor Banks. The trust could not be defeated in this way by means of its own funds, and in favor of the trustee. And the lands whether in the hands of Rowan or of the Lytles’ by conveyance from him without valuable consideration going to the creditors of Lytle are subject to these demands.
The filing a bill and service of process, actual or constructive, is necessary to constitute a lis pendens, and ren der property purchased liable in Ihe hands of a purchaser without actual notice
But we are of opinion that even if the lands conveyed by either Rowan or the Lytles’ during the pendency of either of the suits, may be subjected in the hands of purchasers for value without notice, such lands should not be subjected until the lands remaining in the hands of Rowan’s executors'and the Lytles, are first exhausted. We are further of opinion,, that the conveyance by the Lytles, to the city of Louisville of a part of the wharf having been made before the filing of Hatch’s bill, and before there was any jkppearance or actual or constructive service of process on Lytle, or on his heirs upon Pope’s bill, and when therefore there was no lis pendens as to strangers, the! city cannot bo regarded as a pendente lite purchaser, a¡.nd the interest in the wharf could not on that ground be subjected. Tii these particulars the decree subjecting the property is erroneous.
Upon the question whether any discrimination should be made between the interests of Rowan and the Lytles, and if any in favor of which party we have had considerable difficulty, and are jiot entirely free from doubt with respect to the conclusion to which we have come. The complainants do not discriminate, but pray *319 for the subjection of the land as being purchased in fraud or held in trust. If the trust were to be enforced according to the letter of Rowan to . Lytle, probably these debts would fall wholly upon his portion of the land. But a settlement has evidently been made with the beneficiaries upon some principal not clearly developed, but which so far as it can he traced seems to have been that the burthen and debts against the property should be first borne, and that then the remainder instead of being conveyed to the Lytles should be divided between Rowan and them. If the present claim had been decreed against the land before a division, we think they would have been regarded as a common burthen. And although no provision is made for them in the deeds between the parties, there is no evidence that they were known to the Lytles until after the last deed. And although Rowan knew of Pope’s suit, it had been long dormant, and may have been forgotten or disregarded by him. There is no ground for assuming that the parties intended, or that the Lytles expected that any future claims against the land for their father’s debts, of which they may have supposed there were none, would be thrown wholly upon them. Laying out of view the question of fraud in which if there were any, they had no actual participation, it is an equitable principle that a burthen which was common before partition should be equally or proportionably borne afterwards. Upon this principle and under the circumstances which have been stated, we think it would be just that the claims decreed in these cases should be made equally out of the property formerly belonging to William Lytle, and now held in severalty by Rowan’s executors, and by the heirs of Lytle under deed from Rowan made in consideration of love and affection, and if there be not enough in the hands of either party to meet this principle, the lands, &c., in the hands of the other party under the purchase of Rowan must answer for the deficiency, and in pursuance of *320 the trust as above stated.' In this particular the decree is erroneous.
Where property was purchased undeT execution but in trust for the purchaser’s own indemnity, and for the benefit of the debtor, and a division afterwards made between them: field that_ the parts were liable propoilionably to* the payment of debts of creditors, equally.
Loughborough Ballard, W. Browne, Fry fy Page, for Lytles’.
Thruslon and Pope for Pope’s administrator.
Guthrie for Rowan’s executors.
W. Morris for Hatch.
Wherefore the entire decree as applicable to each case is reversed, and the cases are remanded with directions to ascertain the sums due to the respective complainants upon the principles herein before stated, and to subject the lands and lots and other property held by Rowan’s executors, and the heirs of Lytle (including McCalister,) to the payment thereof according to the principle, and in the manner above indicated.
Lytle’s representatives are entitled to their costs upon their writ of error, and they and Rowan’s executors are entitled to their costs upon the writs of Pope and of Hatch.